**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| ANGEL PIMENTEL )<br><br>    **Plaintiff,** )<br><br>**v.** )<br><br>)<br><br>**WORLD FINANCIAL GROUP** )<br>**INSURANCE AGENCY, LLC** )<br><br>    **Defendant.** )<br><br>) | **Case No. _____**<br><br><br>**JURY DEMAND** |

**COMPLAINT**

Plaintiff, ANGEL PIMENTEL ("Plaintiff"), brings this action against Defendant, World Financial Group Insurance Agency, LLC and hereby alleges as follows:

**PRELIMINARY STATEMENT**

1.      Plaintiff, Angel Pimentel brings this action as a result of breach of contract, workplace harassment, retaliatory behavior and unlawful termination from Defendant, World Financial Group Insurance Agency, LLC ("Defendant" or "WFGIA") in April 2024.

2.      Plaintiff dedicated the majority of her professional career to building a successful business as an insurance agent and broker though tenacity, determination, sacrifice and grit.

3.      Indeed, Ms. Pimentel started her career in California for World Marketing Alliance ("WMA") and then WFGIA as an independent contractor insurance agent and broker. Ms. Pimentel worked incredibly hard to develop a massive client list and recruited additional agents to

1

work in her "downline." WFGIA represented to Ms. Pimentel that she owned her own business as an independent contractor and her client lists were hers.

4.      In 2010, Ms. Pimentel was lured into moving to Tennessee by executive leaders under the false guise of professional opportunity and advancement in WFGIA. However, what awaited her in Nashville was a dysfunctional executive office arrangement with no official branch run by Robbie Day and Anthony "Tony" Duncan, two unmotivated, spiteful, abusive and controlling individuals that would eventually work to destroy Ms. Pimentel's career.

5.       Ms. Pimentel and her husband, R.J. Pimentel (Mr. Pimentel), also a successful WFGIA insurance agent, had to construct their business from scratch in Tennessee as there was no mentorship or substantive assistance from executive leaders.

6.      Over time, the Pimentels were able to recreate their success in Tennessee despite the odds. They eventually opened their own office in the Nashville, Tennessee area and were able to recruit dozens of agents.

7.      In early 2024, Mr. Pimentel decided to join a new insurance company Global Financial Company ("GFI"), which was ostensibly founded by a number of individuals who, in the past, were former WFGIA employees. GFI was offering new and exciting insurance products for clients and provided Mr. Pimentel with an opportunity to get in on the ground floor of a start-up company with tremendous potential.

8.      Angel Pimentel, on the other hand, desired to continue to remain at WFGIA developing the business she had spent over 20 years building with WFGIA. During that time, Angel received many prestigious awards honoring her success and desired to continue running her business and supporting her hierarchy with WFGIA.

2

9.     However, WFGIA executive leadership started a witch hunt to "root out" any employees that they felt were collaborating with GFI. WFGIA wanted to maintain its monopoly of the insurance market in Nashville, Tennessee, Florida and other markets by stamping out any competition.

10.     WFGIA began to target husband and wife couples that they felt were engaging in what they described as an "anchor leg" strategy. WFGIA treated R.J. Pimentel's decision to join GFI as a "defection" and retaliated against Angel Pimentel.

11.     WFGIA began a sustained campaign of bullying, intimidation and harassment against Angel that included isolating her from her team and humiliating her with interviews with WFGIA's counsel. WFGIA's actions –and that of their leadership – created a hostile work environment for Ms. Pimentel.

12.     WFGIA eventually "suspended" Angel under the bogus claims that her "superior" Tony Duncan would no longer supervise her due to possible violations of corporate policy and misconduct.

13.     In mid-April 2024, Tony Duncan spitefully circulated a photo of Ms. Pimentel attending a GFI event in Vermont in support of her husband. Ms. Pimentel's show of support for her husband was now being reframed as a hostile act.

14.      On April 25, 2024, Ms. Pimentel was unlawfully terminated by WFGIA for purported violations of her employment contract. Ms. Pimentel's termination was unsubstantiated by the factual record and unquestionably an unlawful retaliatory act.

15.     To make matters worse, WFGIA subsequently denied Ms. Pimentel access to her client lists and client contact information, which she was always led to believe were her proprietary

information as a "business owner". WFGIA also unilaterally transferred her "downline" agents to other WFGIA agents, and denied her commissions and profits she rightfully earned.

16.     WFGIA defrauded Ms. Pimentel into promises that her work was building equity in her business, brazenly robbed Ms. Pimentel of her livelihood, and subsequently blocked her shamelessly from regaining her financial security.

## PARTIES

17.     Plaintiff, Angel Pimentel is a resident of the State of Tennessee, County of Williamson.

18.     Defendant is World Financial Group Insurance Agency, LLC, ("WFGIA") a limited liability company organized and existing under the laws of the State of Iowa with a principal place of business located at 6400 C Street SW, Cedar Rapids, IA 52499.

19.     Upon information and belief, Defendant's sole member and owner is Transamerica Financial Advisors, Inc. ("Transamerica"). Upon information and belief, Transamerica is organized and existing under the laws of the State of Delaware with a principal place of business located at 6400 C Street SW, Cedar Rapids, IA 52499.

20.     WFGIA is authorized to transact business in the State of Tennessee and transacts business in the State of Tennessee.

## JURISDICTION AND VENUE

21.     This dispute is between citizens of different states, namely Tennessee and Delaware and the amount in dispute between the parties involves a claim of damages by Plaintiff in excess of $75,000, exclusive of interest and costs. Therefore, it meets the jurisdictional requirements of this Court pursuant to 28 U.S.C. § 1332(a).

22.     This dispute also involves claims arising under federal law creating federal question jurisdiction. Plaintiff is asserting claims involving the Sherman and Clayton Antitrust Acts that provide district courts of the United States jurisdiction pursuant to §4 of the Sherman Antitrust Act and, similarly, Section §4 of the Clayton Antitrust Act. See, 15 U.S.C.S. § 4 and § 15.

23.     Venue is correct herein because Plaintiff is a resident of Franklin, Tennessee, and Defendant transacted and continues to transact business within the State of Tennessee. Indeed, the majority of the communications and transactions in question as set forth herein have occurred in Tennessee.

## FACTUAL BACKGROUND

### A.  The Pimentels in California and WFGIA

24.     In 2000, Ms. Pimentel began her career in California with World Marketing Alliance ("WMA") as an insurance agent and broker. WMA offered several insurance products that Ms. Pimentel marketed and sold to a wide range of customers in California.

25.     Ms. Pimentel obtained licenses to market and sell state life and health insurance. She also obtained securities licenses such as a Series 6, 63 and 26.

26.     In June 2001, WMA was purchased and a new company was formed, World Financial Group Insurance Agency ("Defendant" or "WFGIA"). Defendant provides products to customers through independent contractors who are licensed insurance agents. Defendant was a purported "leader" in the insurance industry and, over the past decade has relentlessly pursued the strategic objective of stamping out competition in geographical markets throughout the country and especially in Tennessee.

5

27.     Ms. Pimentel was identified as an independent contractor for Defendant. Defendant made several written and verbal representations that she would continue to own her business and client lists and, for lack of a better term, "be her own boss."

28.     Ms. Pimentel was induced by promises of "business ownership", which WFGIA recently continued advertising on its company websites. This was the main selling point that got her to agree to join WFGIA.



*See* https://www.worldfinancialgroup.com/opportunity/agent-expectations



*See* https://www.worldfinancialgroup.com/business-model



*See* https://www.worldfinancialgroup.com/business-model

29.    Therefore, by joining WFGIA, Ms. Pimentel could continue offering insurance products to customers while also recruiting other insurance agents to work under her. The structure is referred to as a "hierarchy."

30.    The additional agents Ms. Pimentel recruited to WFGIA were referred to as her "downline" and the agents above her in the hierarchy were known as her "upline." WFGIA agents received commissions from the sales of other agents in their downline.

31.    Over the next decade, Plaintiff worked unbelievably hard to develop a massive client list, often traveling around the country and missing precious time with her family. Ms. Pimentel was also able to recruit dozens of agents and, consequently, was making a great income. She was a natural at her job and became a tremendous asset to WFGIA.

B. **The Pimentels move to Tennessee, WFGIA's Agent Agreement and GFI.**

32.    In 2010, Ms. Pimentel was told by Defendant's executive leader, Robert Day that Tennessee possessed huge potential to continue to grow her business and that she could plug into his "well-oiled machine" to get her jump-started.

33.    Mr. Day's representations turned out to be completely fabricated.

7

34.     Ms. Pimentel uprooted her young family from California and moved to the "Volunteer State" based on representations by Defendant and Mr. Day that there was a wealth of untapped potential in the insurance market in the greater Nashville, Tennessee area, which would lead to incredible opportunity for her to advance within WFGIA.

35.     Ms. Pimentel arrived for work in Tennessee to find the Nashville branch in total disarray and disfunction. The branch had no office or trainers for agents and new employees.

36.     The branch was run by Mr. Day's brother-in-law, Mr. Anthony "Tony" Duncan ("Mr. Duncan"). Mr. Duncan played fast and loose with WFGIA rules and regulations and did the bare minimum to keep the branch functioning. Mr. Duncan bristled at any constructive advice or recommendations from Ms. Pimentel to improve the branch's functionality, and compliance with FINRA and TFA home office employees.

37.     Ms. Pimentel and her husband, R.J. Pimentel, who was also a WFGIA independent contractor agent, were forced to start their business in Tennessee from scratch.

38.     The Pimentels worked tirelessly to regenerate the success they had in California. They worked day and night marketing, selling and providing customer service to insurance clients while also recruiting talented agents to work as part of their "downline."

39.     Mr. Day and Mr. Duncan provided no mentorship or guidance to the Pimentels during their time in Day's Nashville branch.

40.     In 2020, the Pimentels graciously permitted Mr. Duncan to use their office address since Robbie Day closed his office. Mr. Duncan displayed lackadaisical behavior and failed to keep proper records for WFGIA audits.

8

41.     In December 2023, the Pimentels asked Mr. Duncan to leave their office to avoid any association with his improper record keeping and poor work performance, especially when it came to audits.

42.     In July 2023, Angel Pimentel signed a new employment agent agreement ("Agreement") with WFGIA, which was a precondition for her to receive earned commission payments.

43.     The Agreement reiterated that Ms. Pimentel was an independent contractor and that she was to "conduct and control her business activities" including customer prospects, business strategies and methods without interference from WFGIA.

44.     The contract was extremely restrictive, containing a two-year non-competition clause and other restrictive provisions to stamp out any chance of competition should an agent be terminated or leave WFGIA.

45.     In early 2024, the Pimentels learned that a new company, Global Financial Company ("GFI") was created by former WFGIA employees and was providing new and exciting insurance products for customers.

46.     R.J. Pimentel ultimately made the difficult decision to stop working with his wife for the opportunity to get in on the ground floor of GFI.

47.     At no point did Angel Pimentel decide that she would leave WFGIA to go to GFI. On the contrary, she thought it was too financially risky for both of them to leave WFGIA for a start-up company.  Angel loved running her own business, managing the client relationships she fostered over the years, and felt that she had worked too hard since coming to Tennessee to start over again at a new insurance company.

### C. **WFGIA's unlawful harassment, bullying, intimidation and termination of Angel Pimentel.**

48.     WFGIA executives and business leaders became aware of R.J. Pimentel's move to GFI and began a sustained campaign of bullying, harassment, intimidation, and retaliation against Angel Pimentel.

49.     For example, WFGIA isolated Angel Pimentel from her team on group chats, excluded her from leadership meetings, and compelled her to have humiliating interviews with WFGIA's legal counsel regarding her husband's departure to GFI.

50.     WFGIA became paranoid that they were losing their iron clad and unlawful grip on the insurance market in Nashville, Tennessee, Florida and other markets. They began to "clean-house" by firing employees they believed were collaborating with GFI under suspicions that they were violating their employment contract with WFGIA.

51.     In March 2024, Ms. Pimentel attended a large GFI meeting in Vermont with her husband. Ms. Pimentel did not hide the fact that she was attending the meeting to support her husband.

52.     WFGIA learned of the meeting when Ms. Pimentel's face was in the background of a photo taken by an attendee of the meeting and maliciously circulated by Tony Duncan.

53.     Instead of viewing Angel's attendance at the GFI meeting as benign support for her spouse or opposition research, WFGIA abruptly suspended Ms. Pimentel. Ms. Pimentel subsequently felt bullied and compelled to resign her securities representation from TFA.

54.     Ms. Pimentel was devastated and humiliated by the unjust suspension. The suspension was the equivalent of a corporate "tar and feathering."

55.    WFGIA denied Ms. Pimentel access to her client lists and contact information, which she was entitled to based on the representations made to her by WFGIA. She immediately lost credibility with her colleagues and subordinates as word spread that she would be terminated.

56.    On April 25, 2024, WFGIA terminated Angel Pimentel via formal correspondence.

57.    WFGIA's termination letter stated that Ms. Pimentel allegedly violated multiple provisions of her employment contract because of, among other things, she allegedly was soliciting business to GFI and failing to cooperate with a company investigation, all of which was all patently false and slanderous.

58.    In addition to denying Ms. Pimentel access to her client lists and contact information, WFGIA transferred Ms. Pimentel's "downline" agents to another agent within WFGIA instead of being portable/transferable as previously represented by WFGIA. WFGIA also denied her profits and commissions that she rightfully earned.

59.    WFGIA's unfounded and paranoid driven decision to terminate Ms. Pimentel has destroyed the business she built in Tennessee for over a decade. WFGIA's employment contract has restricted Ms. Pimentel's ability to continue in the same line of work, effectively shelving her career and leaving her family in serious financial jeopardy.

60.    Ms. Pimentel has been forced to bring this lawsuit to regain her career and financial security.

11

## FIRST CAUSE OF ACTION
### (Breach of Contract)

61.     Plaintiff repeats each and every allegation of the foregoing as if same were set forth herein.

62.     On or about July 24, 2023, Plaintiff signed an agent agreement ("Agent Agreement") with Defendant.

63.     Pursuant to the terms of the Agent Agreement, Defendant had contractual duties and obligations to:

a.  permit Plaintiff to conduct and control her own business activities, customers, business strategies and methods free from any interference from Defendant.

b.  permit Plaintiff to operate her business separately and independently from WFGIA as an independent contractor.

c.  compensate Plaintiff for the sale or referral of WFGIA insurance products and services and for any "downline" agent's sale or referral of insurance products and services.

d.  continue to pay Plaintiff earned commissions after her termination due to her WFGIA hierarchy designation and vested status.

64.     Defendant materially breached its contractual duty and obligation to permit Plaintiff to conduct and control her own business activities, customers, business strategies and methods by interfering in her business activities and customer relationships.

65.     Defendant materially breached its contractual duty and obligation to permit Plaintiff to conduct and control her own business activities, customers, business strategies and methods by creating a hostile work environment in her branch through bullying, harassment, intimidation and humiliation of Plaintiff.

66. Defendant materially breached its contractual duty and obligation to permit Plaintiff to operate her business separately and independently from WFGIA as an independent contractor by denying Plaintiff access to customer lists and contact information that she complied during the course of her business.

67. Defendant materially breached its contractual duty and obligation to permit Plaintiff to operate her business separately and independently from WFGIA by denying Plaintiff access to agent lists and contact information that she complied during the course of her business.

68. Defendant materially breached its contractual duty and obligation to compensate Plaintiff for the sale or referral of WFGIA insurance products and services and for any "downline" agent's sale or referral of insurance products and services by failing to pay Plaintiff earned commissions from her sales or referrals of WFGIA insurance products and services and for her "downline" agents' sales or referral of WFGIA insurance products and services.

69. Defendant materially breached its contractual duty and obligation to compensate Plaintiff for earned commissions after her termination due to her WFGIA hierarchy designation and vested status.

70. As a direct and proximate result of the foregoing, Plaintiff has been damaged thereby, Defendant is responsible to Plaintiff for her damages.

WHEREFORE, Plaintiff demands judgment against Defendant for:

(a) Compensatory damages;

(b) Consequential damages;

(c) Incidental damages;

(d) Interest;

(e) Cost of suit;

(f) Attorneys' fees and

(g) Such other relief the Court deems just and proper.

## SECOND CAUSE OF ACTION
(Intentional Interference with Business Relationship)

71.     Plaintiff repeats each and every allegation of the foregoing as if same were set forth herein.

72.     Plaintiff had an existing business relationship with several insurers and individuals who purchased various insurance products and services through Plaintiff.

73.     Plaintiff had a business relationship with several insurance agents recruited by Plaintiff to work in her "downline" and provided additional commission revenue for Plaintiff.

74.     Defendant was aware of Plaintiff's business relationship with the insurers and individuals as Defendant had access to Plaintiff's customer lists and contact information.

75.     Defendant was aware of Plaintiff's business relationship with the insurance agents as Defendant had access to Plaintiffs agent lists and contact information.

76.     Defendant intentionally interfered with Plaintiff's client relationships by improperly denying Plaintiff access to her client lists and contact information to prevent her from continuing to work with them and directing Plaintiff's clients to other insurance agents.

77.     Defendant intentionally interfered with Plaintiff's agent relationships by improperly denying Plaintiff access to her agent lists and contact information to prevent her from continuing to work with them and re-directing Plaintiff's downline agents to work under other agent(s) in Defendant's established hierarchy.

78.     Defendant's motive to deny Plaintiff access to her customer lists and contact information and directing Plaintiff's downline agents to other insurance agents was to deny Plaintiff any earned commission revenue and obliterate any potential competition.

14

79. Defendant's motive to deny Plaintiff access to her agent lists and contact information and re-directing Plaintiff's downline agents to work under other agent(s) in Defendant's established hierarchy was to deny Plaintiff any earned commission revenue and obliterate any potential competition.

80. As a direct and proximate result of the foregoing, Plaintiff has been damaged thereby, Defendant is responsible to Plaintiff for her damages.

WHEREFORE, Plaintiff demands judgment against Defendant for:

(a) Compensatory damages;

(b) Consequential damages;

(c) Incidental damages;

(d) Interest;

(e) Cost of suit;

(f) Attorneys' fees and

(g) Such other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
(Fraud)

81. Plaintiff repeats each and every allegation of the foregoing as if same were set forth herein.

82. Plaintiff is a duly licensed insurance and securities agent.

83. Defendant intentionally made materially false representations in Plaintiff's Agent Agreement, agent brochures, and verbal communications to Plaintiff regarding Plaintiff's ability to conduct and control her own business activities, customers, business strategies and methods as an independent contractor for Defendant.

15

84. Defendant intentionally made materially false representations in Plaintiff's Agent Agreement, brochures, and verbal communications to Plaintiff regarding Plaintiff's ability to own and control her own client lists and client contact information.

85. Defendant intentionally made materially false representations in Plaintiff's Agent Agreement, agent brochures, and verbal communications to Plaintiff regarding Plaintiff's ability to own and control her own agent lists and agent contact information.

86. Defendant intentionally made materially false representations in Plaintiff's Agent Agreement, agent brochures, and verbal communications to Plaintiff regarding Plaintiff's ability to earn and receive earned commissions from the sale of insurance products and services and from the sales of insurance products and services of her "downline" agents.

87. Plaintiff reasonably relied on Defendant's representations that Plaintiff would be permitted and able to conduct and control her own business activities, control her own client lists and contact information, control her agent lists and contact information, implement her own business strategies and methods, earn and receive commissions from her "downline" agents from sales of insurance products and services, and agreed to work as an independent contractor for Defendant.

88. Plaintiff reasonably relied on Defendant's representations that she would be permitted and able to conduct and control her own business activities, own and control her own client lists and contact information, own and control her agent lists and contact information, implement her own business strategies and methods and receive commissions and relocated to Nashville, Tennessee.

89. Plaintiff reasonably relied on Defendant's representations that she would be permitted and able to conduct and control her own business activities, own and control her own

client lists and contact information, own and control her agent lists and contact information, implement her own business strategies and methods and receive commissions and spent thousands of dollars investing in her business, and spending years developing client and agent relationships.

90.     As a direct and proximate result of Defendant's materially false representations, Plaintiff has been damaged thereby, Defendant is responsible to Plaintiff for her damages.

WHEREFORE, Plaintiff demands judgment against Defendant for:

(a) Compensatory damages;

(b) Consequential damages;

(c) Incidental damages;

(d) Interest;

(e) Cost of suit;

(f) Attorneys' fees and

(g) Such other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
(Negligent Misrepresentation)

91.     Plaintiff repeats each and every allegation of the foregoing as if same were set forth herein.

92.     Plaintiff is a duly licensed insurance and securities agent.

93.     Defendant had a duty to communicate accurate information to Plaintiff regarding her rights and responsibilities as an independent contractor for Defendant.

94.     Defendant breached its duty to communicate accurate information to Plaintiff regarding her rights and responsibilities as an independent contractor for Defendant by negligently making materially false representations in Plaintiff's Agent Agreement, agent brochures, and

verbal communications to Plaintiff regarding Plaintiff's ability to conduct and control her own business activities, customers, business strategies and methods.

95.    Defendant breached its duty to communicate accurate information to Plaintiff regarding her rights and responsibilities as an independent contractor for Defendant by negligently making materially false representations in Plaintiff's Agent Agreement, brochures, and verbal communications to Plaintiff regarding Plaintiff's ability to own and control her own client lists and client contact information.

96.    Defendant breached its duty to communicate accurate information to Plaintiff regarding her rights and responsibilities as an independent contractor for Defendant by negligently making materially false representations in Plaintiff's Agent Agreement, agent brochures, and verbal communications to Plaintiff regarding Plaintiff's ability to own and control her own agent lists and agent contact information.

97.    Defendant breached its duty to communicate accurate information to Plaintiff regarding her rights and responsibilities as an independent contractor for Defendant by negligently making materially false representations in Plaintiff's Agent Agreement, agent brochures, and verbal communications to Plaintiff regarding Plaintiff's ability to receive earned commissions from the sale of insurance products and services and from the sale of insurance products and services from her "downline" agents.

98.    Defendant intended that the information provided to Plaintiff would guide Plaintiff in making her business and career decisions.

99.    Plaintiff justifiably relied on Defendant's representations that Plaintiff would be permitted and able to conduct and control her own business activities, control her own client lists and contact information, control her agent lists and contact information, implement her own

18

business strategies and methods and receive commissions and agreed to work as an independent contractor for Defendant.

100.   Plaintiff justifiably relied on Defendant's representations that Plaintiff would be permitted and able to conduct and control her own business activities, control her own client lists and contact information, control her agent lists and contact information, implement her own business strategies and methods and receive commissions and relocated to Nashville, Tennessee.

101.   Plaintiff justifiably relied on Defendant's representations that Plaintiff would be permitted and able to conduct and control her own business activities, control her own client lists and contact information, control her agent lists and contact information, implement her own business strategies and methods and receive commissions and spent tens of thousands of dollars investing in her business and spending countless hours developing client and agent relationships.

102.   As a direct and proximate result of Defendant's negligent misrepresentations, Plaintiff has been damaged thereby, Defendant is responsible to Plaintiff for her damages.

WHEREFORE, Plaintiff demands judgment against Defendant for:

(a) Compensatory damages;

(b) Consequential damages;

(c) Incidental damages;

(d) Interest;

(e) Cost of suit;

(f) Attorneys' fees and

(g) Such other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### (Promissory Estoppel)

103.    Plaintiff repeats each and every allegation of the foregoing as if same were set forth herein.

104.    Plaintiff is a duly licensed insurance and securities agent.

105.    Defendant made false promises and representations to Plaintiff in an Agent Agreement, agent brochures, and verbal communications that she would have the ability to conduct and control her own business activities, customers, business strategies and methods as an independent contractor for Defendant.

106.    Defendant made false promises and representations to Plaintiff in an Agent Agreement, brochures, and verbal communications that she would have the ability to own and control her own client lists and client contact information.

107.    Defendant made false promises and representations to Plaintiff in an Agent Agreement, agent brochures, and verbal communications that she would have the ability to own and control her own agent lists and agent contact information.

108.    Defendant made false promises and representations to Plaintiff in an Agent Agreement, agent brochures, and verbal communications that she would have the ability to receive earned commissions from the sale of insurance products and services and from the sale of insurance products and services from her "downline" agents.

109.    Plaintiff reasonably relied on Defendant's promises and representations that Plaintiff would be permitted and able to conduct and control her own business activities, control her own client lists and contact information, control her agent lists and contact information, implement her own business strategies and methods and receive commissions and agreed to work as an independent contractor for Defendant.

110.    Plaintiff reasonably relied on Defendant's representations that Plaintiff would be permitted and able to conduct and control her own business activities, own and control her client lists and contact information, own and control her agent lists and contact information, implement her own business strategies and methods and receive commissions and relocated to Nashville, Tennessee.

111.    Plaintiff reasonably relied on Defendant's representations that Plaintiff would be permitted and able to conduct and control her own business activities, own and control her client lists and contact information, own and control her agent lists and contact information, implement her own business strategies and methods and receive commissions and spent tens of thousands of dollars investing in her business and spending countless hours developing client and agent relationships.

112.    Plaintiff's reliance on Defendant's representations were reasonable and foreseeable.

113.    As a direct and proximate result of Defendant's false promises and representations, Plaintiff has been damaged thereby, Defendant is responsible to Plaintiff for her damages.

WHEREFORE, Plaintiff demands judgment against Defendant for:

(a) Compensatory damages;

(b) Consequential damages;

(c) Incidental damages;

(d) Interest;

(e) Cost of suit;

(f) Attorneys' fees and

(g) Such other relief the Court deems just and proper.

## SIXTH CAUSE OF ACTION
### (Conversion)

114.    Plaintiff repeats each and every allegation of the foregoing as if same were set forth herein.

115.    Plaintiff is a duly licensed insurance and securities agent and was employed by Defendant as an independent contractor pursuant to an Agent Agreement.

116.    Plaintiff owned her own client list and contact information as an independent contractor for Defendant.

117.    Plaintiff owned her own agent list and agent information as an independent contractor for Defendant.

118.    Defendant has intentionally and illegally denied Plaintiff access to her client and agent lists and contact information.

119.    Defendant has intentionally and illegally withheld tens of thousands of dollars in earned revenue and commissions from Plaintiff through insurance product and service sales by Plaintiff and her downline agents.

120.    Defendant has intentionally and illegally denied Plaintiff access to her client and agent lists and contact information for Defendant's own use and benefit.

121.    Defendant has intentionally and illegally withheld tens of thousands of dollars in earned revenue and commissions from Plaintiff for Defendant's own use and benefit.

122.    Plaintiff is entitled to tens of thousands of dollars in revenue and commissions from Defendant that Plaintiff earned from the sale of insurance products and services.

123.    Plaintiff is entitled to tens of thousands of dollars in revenue and commissions from Defendant that Plaintiff earned from the sale of insurance products and services by the agents she recruited and that are part of her "downline."

22

124.     As a direct and proximate result of the foregoing, Plaintiff has been damaged thereby, Defendant is responsible to Plaintiff for her damages.

WHEREFORE, Plaintiff demands judgment against Defendant for:

(a) Compensatory damages;

(b) Consequential damages;

(c) Incidental damages;

(d) Interest;

(e) Cost of suit;

(f) Attorneys' fees and

(g) Such other relief the Court deems just and proper.

### SEVENTH CAUSE OF ACTION
(Unjust Enrichment)

125.     Plaintiff repeats each and every allegation of the foregoing as if same were set forth herein.

126.     Plaintiff is a duly licensed insurance and securities agent and was employed by Defendant as an independent contractor pursuant to an Agent Agreement.

127.     Plaintiff is entitled to tens of thousands of dollars in revenue and commissions from Defendant that Plaintiff earned from the sale of insurance products and services.

128.     Plaintiff is entitled to tens of thousands of dollars in revenue and commissions from Defendant that Plaintiff earned from the sale of insurance products and services by the agents she recruited and that are part of her "downline."

129.     Defendant knew or should have known that they owed Plaintiff tens of thousands of dollars in revenue and commissions Plaintiff earned from the sale of insurance products and services.

23

130.     Defendant knew or should have known that it owed Plaintiff tens of thousands of dollars in revenue and commissions Plaintiff earned from the sale of insurance products and services by her "downline" agents.

131.     Defendant has been unjustly enriched by withholding and enjoying the tens of thousands of dollars of revenue and commissions owed to Plaintiff through insurance product and service sales by Plaintiff and her downline agents.

132.     As a result of Defendant's unjust enrichment, Plaintiff has been damaged thereby, Defendant is responsible to Plaintiff for her damages.

WHEREFORE, Plaintiff demands judgment against Defendant for:

(a) Compensatory damages;

(b) Consequential damages;

(c) Incidental damages;

(d) Interest;

(e) Cost of suit;

(f) Attorneys' fees and

(g) Such other relief the Court deems just and proper.

**EIGHTH CAUSE OF ACTION**
(Wrongful Termination-Retaliatory Discharge)

133.     Plaintiff repeats each and every allegation of the foregoing as if same were set forth herein.

134.     Plaintiff is a is a duly licensed insurance and securities agent and was employed by Defendant as an independent contractor pursuant to an Agent Agreement.

135.     Plaintiff is an excellent insurance agent and is the recipient of numerous performance awards and prizes from Defendant.

136.    On or about April 25, 2024, Defendant wrongfully terminated Plaintiff.

137.    Defendant terminated Plaintiff for exercising her First Amendment right to free speech and assembly under the United States Constitution for attending an event in support of her husband's work in Vermont.

138.    Plaintiff did not engage in any business related communications or transactions at her husband's work event and was only present to support her husband.

139.    Plaintiff's attendance at her husband's work event in Vermont was unequivocally a substantial factor motivating Defendant's decision to terminate Plaintiff, as evidenced by the termination letter she received and prior and subsequent communications with Defendant's counsel, employees, representatives and agents.

140.    As a direct and proximate result of the foregoing, Plaintiff has been damaged thereby, Defendant is responsible to Plaintiff for her damages.

WHEREFORE, Plaintiff demands judgment against Defendant for:

(a) Compensatory damages;

(b) Consequential damages;

(c) Incidental damages;

(d) Interest;

(e) Cost of suit;

(f) Attorneys' fees and

(g) Such other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### (Violation of Sherman Anti-Trust Act, 15 U.S.C. § 2)

141.    Plaintiff repeats each and every allegation of the foregoing as if same were set forth herein.

142.    Defendant was party to a conspiracy with major insurance providers, agents and brokers to destroy any competition in the insurance market in the geographical region of Tennessee.

143.    Defendant executed on its conspiracy to destroy competition in the insurance marker by inducing independent agents to join their ranks with promises that they would own and could transfer, sell, or alienate their "business" which resulted in would-be competitors becoming part of the WFGIA machine as opposed to companies in competition with WFGIA for the same territories, clients, and agents.

144.    Defendant executed on its conspiracy to destroy competition in the insurance market in Tennessee by requiring thousands of employees, agents and representatives to sign agreements that prevented them working for a competitor for at least two years.

145.    Defendant executed on its conspiracy to destroy competition in the insurance market in Tennessee by intimidating, harassing and threating employees, agents and representatives with termination and litigation for working for a competitor.

146.    Defendant executed on its conspiracy to destroy competition in the insurance market in Tennessee by litigating against other insurance carriers.

147.    Defendant's restrictive agreement, intimidation, harassment and threats of termination and litigation has resulted in an unreasonable restraint on competition in the insurance market in Tennessee.

148.    As a direct result of Defendant's unlawful actions, Defendant wrongfully controls a grossly disproportionate share of the insurance market in Tennessee in violation of the Sherman Antitrust Act, 15 U.S.C. § 2.

149.    Plaintiff has been damaged by Defendant's unlawful actions having been terminated by Defendant for allegedly associating with a competitor and restrained from obtaining employment in the insurance field in Tennessee due to the non-competition provisions in her agreement with Defendant.

WHEREFORE, Plaintiff demands judgment against Defendant for:

(a)  Treble damages;

(b)  Compensatory damages;

(b)  Consequential damages;

(c)  Incidental damages;

(d)  Interest;

(e)  Cost of suit;

(f)  Attorneys' fees and

(g)  Such other relief the Court deems just and proper.

## TENTH CAUSE OF ACTION
(Violation of Section 3 of the Clayton Anti-Trust Act, 15 U.S.C. § 14)

150.    Plaintiff repeats each and every allegation of the foregoing as if same were set forth herein.

151.    Defendant is a company is engaged in interstate commerce and provides insurance products to customers through independent contractors who are licensed insurance agents.

152.     Defendant knowingly and willingly engaged in a course of conduct designed to improperly create a monopoly in the insurance market in Tennessee.

153.     Defendant's course of conduct included, but was not limited to:

    a.  Entering into contracts and or agreements with insurance providers, agents and or brokers to prevent the employment of former employees and independent contractors in Tennessee;

    b.  Entering into contracts and or agreements with insurance providers, agents and or brokers to prevent them from selling, advertising and or servicing insurance products with any competitor in Tennessee;

    c.  Entering into contracts and or agreements with insurance providers, agents and or brokers to prevent insurance product consumers from switching their insurance agent of record to a former employee and or independent contractor;

    d.  Entering into contracts and or agreements with insurance providers, agents and or brokers to prevent insurance product consumers from switching their insurance servicer to a competitor;

    e.  Threatening, intimidating and harassing insurance providers, agents and brokers to prevent them from selling, advertising and or servicing insurance products with any former employees or independent contractors in Tennessee;

    f.  Threatening, intimidating and harassing insurance providers, agents and brokers to prevent them from selling, advertising and servicing insurance products with any competitor in Tennessee;

g.  The prosecution of baseless sham litigation(s) against former employees and independent contractors for purportedly violating non-compete and non-solicitation provisions in their respective "Agent Agreements;" and

h.  The prosecution of baseless sham litigation(s) against competitors for tortious interference with business relationships.

154.  The effect of Defendant's unlawful course of conduct was to substantially lessen competition and/or create a monopoly in the insurance market in Tennessee.

155.  As a direct result of Defendant's unlawful actions, Defendant wrongfully controls a grossly disproportionate share of the insurance market in Tennessee in violation of Section 3 of the Clayton Antitrust Act, 15 U.S.C.S. § 14 and other federal and local antitrust laws.

156.  Plaintiff has been damaged by Defendant's unlawful actions having been terminated by Defendant for allegedly associating with a competitor and restrained from obtaining employment in the insurance field in Tennessee.

WHEREFORE, Plaintiff demands judgment against Defendant for:

(a) Damages and equitable relief under § 16 of the Clayton Antitrust Act, 15 U.S.C.S. § 26;

(b) Treble damages;

(c) Compensatory damages;

(b) Consequential damages;

(c) Incidental damages;

(d) Interest;

(e) Cost of suit;

(f) Attorneys' fees and

(g) Such other relief the Court deems just and proper.

## **PRAYER FOR RELIEF**

157.    Awarding Plaintiff compensatory damages including past and future earnings, revenue, commissions, loss of property and/or proprietary information, inconvenience and embarrassment in an amount to be proven at trial in excess of $75,000.

158.    Awarding Plaintiff equitable relief under the Sherman and Clayton Antitrust Acts in an amount to be proven at trial.

159.    Awarding Plaintiff treble damages under the Sherman and Clayton Antitrust Acts in an amount to be proven at trial.

160.    Awarding Plaintiff consequential damages in an amount to be proven at trial.

161.    Awarding Plaintiff incidental damages in an amount to be proven at trial.

162.    Awarding Plaintiff punitive damages in an amount to be proven at trial.

163.    Awarding Plaintiff attorneys' fees, costs, and interest.

164.    Awarding Plaintiff such further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues subject to trial.

Respectfully submitted,

**DICKINSON WRIGHT PLLC**


*/s/ Stephen M. Montgomery*
Stephen M. Montgomery, TN Bar #26489
Fifth Third Center
424 Church Street, Suite 800
Nashville, TN 37219-2392
Tel.:  615-244-6538
smontgomery@dickinsonwright.com


**CALLAGY LAW, P.C.**
Robert Solomon
New Jersey Bar # 159272016

(***Pro Hac Vice motion forthcoming***)
*Counsel for Plaintiff*



Date: August 5, 2024